CASE No. 1045.

IN RE FIFTY-FOUR FIRST MORTGAGE BONDS.

GIBBES v. GREENVILLE AND COLUMBIA RAILROAD COMPANY.

STATE, *EX RELATIONE* ATTORNEY-GENERAL, v. SAME.

1. Under action pending in the name of the state for the foreclosure of a mortgage upon the property of a railroad corporation, and the appointment of a receiver, and on the motion of the attorney-general for such appointment, an order was passed by the court in the words following: "As the state cannot be required to give security as other plaintiffs, it is *ordered*, that the president and directors of the Greenville and Columbia Railroad Company, under the order of and subject to this court, continue in the possession and management of the property of all kinds of the said company ; and in like manner continue to conduct and carry on the business of the said company ; that they make report to this court, at such times as this court may require, of the condition of the property of all kinds of the said company, of its earnings and profits and expenditures, to the end that such orders may, from time to time, be moved for, as may be necessary and proper for the protection of the property of the said company, and the interests of all parties concerned, pending litigation." *Held*, that this order constituted the president and directors of the corporation receivers, and that they continued in the management of the road and its business, as officers of the court and not of the company. SIMPSON, C. J., *dissenting*.

2. A referee in the cause reported $241,000 of this company's past-due bonds, secured by the lien of a first mortgage, as still outstanding, to which finding no exceptions were taken, and the report was approved by the Circuit Court. After the appointment of the receivers, fifty-four of these first mortgage bonds were purchased by these officers—some before the report of the referee, and some afterwards, but all before the approval of the report—and entered upon the books of the corporation as investments, and not as paid, and for several years reported to the company as still outstanding, and they were then re-issued for value. *Held*, that these fifty-four bonds had not been paid, and in the hands of their purchasers, were secured by the lien of the first mortgage. SIMPSON, C. J., *dissenting*.

3. Appeal from a decree rendered in term time dismissed—a copy of the exceptions not having been furnished to the trial-judge within ten days after the rising of the court. *Ex parte Clyde*, 14 *S. C.* 385, recognized and followed.

Before Hudson, J., Richland, July, 1880.

Hon. A. P. Aldrich, judge of the Second Judicial Circuit, sat at the hearing of this appeal in the place of Associate Justice Mc-Gowan, who had been of counsel.

This case involves a contest between creditors of the Green-ville and Columbia Railroad Company. It is therefore a branch of the parent-case reported 13 *S. C.* 228, but raises points not there considered.

On May 6th, 1872, James S. Gibbes and other creditors of the Greenville and Columbia Railroad Company, filed their complaint against this corporation and other defendants, praying that the rank and lien of the several mortgages on the property of the company be declared, and the order fixed in which they should be paid, and so forth. On June 11th, 1872, the attorney-general of South Carolina filed his complaint in the name of "The State of South Carolina by the attorney-general," against this same corporation, and others, its creditors, praying that the rights of the state under an act of the general assembly be declared and its interests protected, a mortgage held by the state be foreclosed, a receiver appointed, and suing and judgment creditors be enjoined, &c.

On June 18th, 1872, Judge Melton, on motion of the attorney-general for the appointment of a receiver, and by consent of other counsel, filed his order wherein he restrained creditors from suing, or enforcing their judgments, appointed John S. Green referee to call in creditors "to make proof before him of their several and respective claims," and to "take testimony as to the liens set up against the said company, their order of priority, and the amounts respectively secured by such liens," and to make report to the court. The order further provided : "As the state cannot be required to give security as other plaintiffs, it is ordered that the president and directors of the Greenville and Columbia Railroad Company, under the order of, and subject to this court, continue in the possession and management of the property of all kinds of the said company, and in like manner continue to conduct and carry on the business of the said company ; that they make report to this court, at such times as this

court may require, of the condition of the property of all kinds, of the said company, of its earnings, and profits, and expenditures, to the end that such orders may, from time to time, be moved for, as may be necessary and proper for the protection of the property of the said company, and the interests of all parties concerned, pending litigation."

On November 15th, 1872, Mr. Green, the referee, reported, *inter alia:* "1st. First mortgage bonds—Furman, trustee. Outstanding, $241,000." To this part of the referee's report there was no exception taken by parties then before the court, or afterwards brought in by amended pleadings.

On May 13th, 1878, Judge Shaw passed an order directing that the substituted trustees of the first and second mortgages, be made parties, with leave to them "to file exceptions to the reports of the referees in the above-entitled cases." Amended complaints were filed in both cases in August, 1878, and they both alleged that there were still outstanding "$241,000 of first mortgage bonds." W. A. Clark, substituted trustee of the second mortgage, answered the amended complaint of Gibbes and others, but did not deny this allegation. He also excepted to the report of Referee Green, but not to the number of outstanding first mortgage bonds. This was in August, 1878.

The order of Judge Pressley, of November 23d, 1878, appointing a receiver, is substantially stated in the opinion. He considered that the order of Judge Melton made the president and directors of the company "officers of this court and responsible to it in the character of receivers." Judge Pressley's decree bears date September 6th, 1879. He says: "The report of the referee shows that holders of $241,000 of first mortgage bonds did not exchange them for those authorized by this act." He finds as a conclusion of fact: "4. After payment of said debts, the first mortgage bonds outstanding, and those held by the state, with all unpaid interest thereon, are the first lien on said property." He directs further inquiry as to the amount of several classes of bonds, but none as to the amount of outstanding first mortgage bonds. (The full decree may be read, if desired, in 13 *S. C.* at page 229.) This decree was affirmed on appeal, but the points involved here were not embraced in the exceptions there taken.

On November 29th, 1879, Judge Mackey passed an order directing the sale of the road on April 15th, 1880; and one other order referring it to N. B. Barnwell, the master of the court, to call upon the bondholders of this company, including those secured by the first mortgage, to produce their bonds and " make proof of the same, and of the amount of principal and interest due on the same," and that the master classify the bonds so proved in the following classes: 1. First mortgage bonds " not exchanged for bonds guaranteed by the state and now outstanding in the hands of persons holding the same."

In the matter of a claim for counsel fees, Judge Mackey passed a third order in this cause, in which, *inter alia,* " 1. It is adjudged that the order passed by Judge Melton, in the case of State, *ex rel.* the Attorney-General, against the Greenville and Columbia Railroad Company, on the 18th day of June, 1872, did constitute the officers of the company the receivers of this court for the operation of the road and the protection of the defendant's property."

At a reference held before Mr. Barnwell, master, under Judge Mackey's order, the National Bank of Greenville, William Knobeloch, T. J. Robertson and others, produced first mortgage bonds, fifty-four in number, which, it was conceded, were included in Referee Green's " $241,000 first mortgage bonds outstanding;" but they were objected to by other creditors, holding securities of an inferior lien, upon the ground that they were paid.   The facts were, that these bonds all fell due July 1st, 1863, and March 1st, 1864, were purchased with funds of the company by its treasurer, under directions of the president, between March 7th, 1872, and January 6th, 1874, and re-issued in October, 1875, and in January, 1877, as collateral security for loans made to operate the road, or sold for the same purpose.   " These bonds were purchased just as other securities were purchased, and were entered upon the books of the company as investments; we were not prepared to retire any bonds," is the testimony of the treasurer.   From April, 1874, to May, 1878, inclusive, these bonds were reported in the treasurer's annual report as outstanding.

The master, by his report of May 10th, 1880, (upon the matters involved, fully stated in the opinion,) found that these fifty-

four bonds were not entitled to the lien of the first mortgage. Upon exceptions by the holders of these bonds to this report, Judge Hudson filed his decree in open court July 27th, 1880, by which the master's report was confirmed, except in a particular not considered by this court.

The holders of these bonds served the following exceptions:

1. For that his Honor held that the *status* of the fifty-four bonds was not *res judicata*.

2. For that his Honor held that the action of the railroad company, in taking up and re-issuing said bonds, extinguished their lien, notwithstanding the provisions of the act of January 28th, 1861.

3. For that his Honor held that the said bonds were not entitled equitably to rank with the guaranteed bonds.

4. For that his Honor held that neither the *status* of the president and directors of the railroad company, resulting from the order of June 18th, 1872, nor their intention in taking up said bonds *pendente lite*, prevented the usual effect of such bonds being taken up by an obligor and mortgagor.

5. For that his Honor overruled the exceptions made by these exceptants to the report of the master, submitted on May 10th, 1880, in relation to the fifty-four bonds, of which those proven by exceptants formed a part.

6. For that his Honor did not hold that, under all the circumstances of the case, the holders of the fifty-four bonds were, in the marshaling of securities for the purpose of distribution of the assets of the railroad company, equitably entitled to the position of *bona fide* holders for value, without notice of defects.

Notices of appeal and these exceptions were duly served and furnished. Mr. Fisher, receiver, also appealed upon a ground which it was unnecessary for this court to consider under the conclusions reached by them, but he failed to serve the presiding judge with copies of his notice and exceptions within ten days after the rising of the court.

*Mr. J. P. K. Bryan*, for National Bank of Greenville, appellant.

The question of the validity of these bonds is *res adjudicata*. 1 *Rich. Eq.* 1; 12 *Rich. Eq.* 138; 7 *S. C.* 134; 14 *S. C.* 225. The individual bondholders are bound, as their trustees were parties to the cause. 3 *Otto* 160; 10 *Otto* 611. A Court of Equity will keep an encumbrance alive or consider it extinguished, as will best serve the purposes of justice and the actual and just intention of the parties. 18 *Ves.* 384; 6 *Johns. Ch.* 423. But the company never paid these bonds—they were taken up by the receivers. The president and directors, by Judge Melton's order, were made receivers. *High on Receivers*, § 184; *Kerr on Receivers* 136, 169, 170; 20 *Beav.* 349; 54 *Barb.* 216. As receivers, these officers were not the legal representatives of the corporation. *Kerr on Receivers* 2, 168, 196, 206; 7 *How.* 331, and particularly *Whitley* v. *Lowe*, 25 *Beav.* 431.

*Mr. J. H. Rion*, for T. J. Robertson, appellant.

*Mr. James Simons*, for William Knobeloch, appellant.

*Mr. D. T. Corbin*, for J. H. Fisher, receiver, appellant.

*Mr. S. W. Melton*, for W. A. Clark, trustee, respondent.

Purchase by a debtor of his own obligation with his own funds, and payment of such obligation, are convertible terms. *Byles on Bills* 54; 2 *Pars. on Cont.* 715; 4 *Wels., H. & G.* 13; 2 *Bail.* 203; *Dan. on Neg. Inst.*, § 1285. The extinguishment of the debt extinguishes the mortgage; re-issuing the debt cannot revive the mortgage as against intervening encumbrances. 10 *Rich. Eq.* 487; 2 *Jones on Mort.*, §§ 889–948; *Herm. on Mort.*, § 173; 6 *N. Y.* 449; 5 *Cow.* 671; 20 *N. Y.* 395; 2 *Allen* 118; 3 *Id.* 339; 3 *Metc.* 55; 33 *N. H.* 532; 15 *Vt.* 374. The necessary conditions of *res adjudicata* do not exist. 7 *T. R.* 56; 3 *Cl. & F.* 510; 114 *E. C. L.* 255. This question was never considered. These officers were never appointed receivers—they were merely permitted to retain possession for the company. Why was not the word "receiver" used? If receivers, where is their authority to purchase and sell bonds? The holders are

clearly not *bona fide* holders without notice, for the bonds were past due and dishonored.   50 *N. Y.* 158; 8 *S. C.* 305.

June 29th, 1881.   The opinion of the court was delivered by

ALDRICH, A. A. J.    Other branches of these causes have been before this court.   I have not had the benefit of the argument therein, but proceed to present the questions submitted as they appear to me at the present hearing.

June 18th, 1872, Judge Melton made an order on a motion to appoint a receiver.

1. Restraining creditors of the Greenville and Columbia Railroad Company from instituting writs, and judgment creditors from enforcing their judgments.

2. That the president and directors of the company, " under the order and subject to this court," continue in possession and conduct and carry on the business of the company, and " make report to this court at such times as the court may require of the condition of the property of all kinds of the said company, of its earnings and profits and expenditures, to the end that such orders may, from time to time, be moved for as may be necessary and proper for the protection of the property of the said company and the interest of all parties concerned pending litigation."

3. That Mr. Green be appointed referee, to call in, by advertisements in the newspapers, the creditors of the company, " to take testimony as to the liens set up against the said company, and the amounts respectively secured by such liens."

Under this order Mr. Green held references and submitted his report, dated November 15th, 1872.   In this report he classifies the priority of liens as follows :

1. First mortgage bonds outstanding, $241,000.

2. Guaranteed bonds outstanding, $1,419,071.55.

3. Second mortgage bonds outstanding, $1,200,000.

June 11th, 1872, Mr. Attorney-General Chamberlain filed a complaint on the part of the state, in which he prays " that a receiver be appointed of all the property, assets and effects of the defendants, to hold and keep the same subject to the further order of this court."

May 13th, 1878, Judge Shaw filed an order to amend the

complaint by making H. H. De Leon, trustee, a party, which was done August, 1878.

November 23d, 1878, Judge Pressley, after hearing argument in the cases, as amended, filed a judgment, in which he says: "I consider that the said order of Judge Melton," (June 18th, 1872,) "did make the officers of the Greenville and Columbia Railroad Company officers of this court and responsible to it in the character of receivers, but they have not executed the proper bond, nor have they filed their accounts or performed the other duties required by that order. It is, therefore, incumbent upon me to put an end to that condition of the property, and to place it more substantially in the hands and under the custody and order of this court." He appoints Mr. Conner receiver.

September 6th, 1879, Judge Pressley filed his decree, holding "that the statutory liens, under the acts of 1861, 1866 and 1869, were securities for the payment of the bonds therein authorized, not mere indemnities to the state, and, therefore, it had no right to waive them in favor of the second mortgage." From this decree there was an appeal by De Leon, trustee, and Clark, trustee, but no exception was taken to that portion of the order of November 23d, 1878, which adjudged that the order of Judge Melton, June 18th, 1872, "did make the officers of the Greenville and Columbia Railroad Company officers of this court, and responsible to it in the character of receivers."

March 24th, 1880, this court, Mr. Justice McGowan delivering the opinion, dismissed the appeal and affirmed the Circuit decree.

November 29th, 1879, Judge Mackey made an order for the sale of the road; and, on the same day, filed another order directing holders of bonds to make proof of the same before the master, who is directed to "classify the bonds guaranteed by the state."

December 19th, 1879, Judge Mackey filed his decree, in which he decides: "It is adjudged that the order of Judge Melton, June 18th, 1872, did constitute the officers of the company the receivers of this court for the operation of the road and the protection of the defendant's property," &c.

Auditor Manson testifies: "It was not the intention of Mr.

Magrath to pay these bonds; we were not prepared to retire any bonds; these bonds were entered as an actual investment in company's books, and were purchased as any other securities were purchased by the company as an investment of company funds; these bonds were used for the purpose of raising money to operate the *road* by pledging them as collaterals for loans."

He also proves that from 1874 to 1878, the $241,000 of first mortgage bonds were reported to the company as "first mortgage bonds then outstanding."

. The note to Knobeloch for $9000, and the two notes to the National Bank of Greenville for $5000 each, are secured by "first mortgage bonds past due."

Mr. Barnwell, master, reports upon the testimony: "These fifty-four bonds are not entitled to the security of the mortgage to C. M. Furman, and they are not, in the hands of the present holder, first mortgage bonds of the Greenville and Columbia Railroad Company." He also reports: "These bonds having been proven before John S. Green in 1872, a referee in one of these cases, their *validity* cannot now be questioned. As to this view, it only applies as a matter of fact to a portion of them; as a matter of law, I feel called upon by the order of this court to treat all bonds as unproved until they are submitted to me and are proved before me, to my satisfaction, to be what they purport to be. I have, therefore, passed on these bonds as I have done on all others, without regard to whether or not they had been passed upon by Referee J. S. Green. It is also claimed for them that in fact a great many of these bonds were not re-issued by the company, but by a receiver of this court. As I am fully of the opinion that there was no receiver of this road until the appointment of James Conner as receiver," &c.

To this report exceptions were filed on the part of Knobeloch, Palmer, Robertson and National Bank of Greenville.

July 27th, 1880, Judge Hudson filed his decree, in which he overrules the exceptions, except those of the National Bank of Greenville. From this decree the cause now comes to this court on appeal.

The railroad interest, although in its infancy, has attained such vast proportions, commercial, financial and, I may add, political,

that it becomes us to proceed with great caution in prescribing the rules of law by which these corporations are to be governed. The questions constantly arising are of such novel aspect that it can hardly be said any fixed rules of construction have yet been established. By combinations and skillful management they have acquired an influence that seriously affects the interest of society in all its relations. This court cannot legislate, but in giving construction to the acts of the legislature granting charters and privileges, it will be careful to adopt such rules as will most effectually guard the public from imposition, while it preserves the chartered rights of the corporations. In the interest of society a vast power has been concentrated in these enterprises; the right of eminent domain has been invoked in their behalf, and it becomes us to see, that while all their just and chartered rights are preserved, the public shall not be damaged.

Two questions arise here:

*First.* The proper construction of the order of Judge Melton of June 18th, 1872.

*Second.* When these fifty-four bonds were taken up by President Magrath, was it with the intent to retire them, or was it for the purpose of an investment, to afford him negotiable securities by which he could hold in hand the current earnings of the road to meet its current expenses?

Judge Melton's order was passed on a *motion for a receiver.* It provides that the president and directors, " *under the order and subject to this court,*" shall continue in possesssion of the road; conduct and carry on its business; make a report to the court of its condition, earnings, profits and expenditures. It appoints a referee to report the order and priority of the liens against the company, and *restrains* judgment and *suing* creditors. Now if this order did not make the president and directors receivers, for what purpose was it made?

It will be remembered that on June 11th, 1872, Mr. Chamberlain, then attorney-general, filed his complaint praying: " That a receiver be appointed of all the property, assets and effects of the defendants, to hold and keep the same subject to the further order of this court." Seven days after, Judge Melton filed his order of June 18th, 1872. Was not that in response to

the prayer of the complaint filed by the attorney-general on the part of the state ? Did it not invest the president and directors with all the attributes of a receiver ? We need be at no loss to determine who is a receiver since *Gadsden* v. *Whaley*, 14 *S. C.* 210. Mr. Justice McGowan, after reviewing all the authorities, happily defines him as " an executive officer of the court, to administer the assets of the estate under the direction of the court, which may, for the purpose of preserving the property, restrain the executor from intermeddling with the management of the estate and compel him to give up the control of it to the receiver ; but such appointment and administration do not remove the executor or administrator or destroy his character as the legal representative of the estate. The authority of a receiver rests only in the orders of the court by which he is appointed. By virtue of any general authority as receiver he has no right to sue or be sued or defend." Now here were the president and directors of this road, on a prayer to appoint a receiver, directed to take charge of the property, manage it, report its earnings and expenditures, a referee appointed to call in creditors and report the *priority* of liens, and creditors, *suing* and judgment, restrained. From this order there was no appeal : it stood as the judgment of the court from 1872 to 1878. On November 23d, 1878, Judge Pressley filed a judgment, in which he said : " I consider that the order of Judge Melton made the officers of the Greenville and Columbia Railroad Company officers of the court and responsible thereto in the character of receivers." From this there was no appeal. Then Judge Mackey, December 19th, 1879, filed his decree, in which he said : " It is adjudged that the order of Judge Melton did constitute the officers of the company the receivers of this court for the operation of the road and the protection of the defendant's property." From this there was no appeal. Nor do we hear their character as receivers questioned until the coming in of the report, May 10th, 1880, in which Mr. Barnwell, the master, reports there was no receiver until the appointment of Mr. Conner. Judge Hudson does not pass on this question, as he holds that whether receivers or officers of the company, the purchasers of past-due obligations can only rank as holders of unsecured bonds. I have not drawn on the

*wealth* of authority contained in the arguments of the distinguished counsel who have presented these cases ; that would extend this opinion unnecessarily, and the references will be found in the report. We conclude, therefore, and so adjudge, that the order of Judge Melton, June 18th, 1872, appointed the president and directors of the company receivers of the court.

Which brings us to the second inquiry. When these fifty-four bonds were " taken up," was it payment, and when re-issued were they deprived of the protection of the original security ? This is a question of right and intent. It may well be questioned, if, under the order of the court appointing the president and directors receivers, they had authority to pay and retire the bonds secured by the first mortgage. They were required to carry on the business of the company—make report of its condition, earnings, profits and expenditures—for what purpose? That the court may make such orders as may be moved for, to protect the property and the interest of all parties concerned. The court was as anxious to preserve the liens and securities of the bondholders and other creditors as it was to preserve the property of the company which protected them. It was not to create dispute and litigation, for, to prevent this, creditors of all classes were enjoined. The receiver *is* the officer of the court, as Mr. Justice McGowan emphatically says, " *its hand,*" to manage the property under the direction of the court for the best interest of all concerned. No preferences are to be shown, no practices tolerated that will give advantage to one class of creditors to the detriment of another class, but the whole business is to be managed on the basis of the broadest equity. Hence large discretion is allowed him in the financial manipulation of the assets ; he may call in or put out the securities of the company as, in his judgment, will best enable him to secure the property to the stockholders and pay off its creditors; subject always to the check of the court. If, in doing this, he takes up bonds one month and re-issues them the next, to save interest and enable him to meet the current expenses on the most economical scale, I do not see that he thereby destroys the lien of the bond taken up, which made it a secure investment when originally issued and which is supposed to retain its lien as it passes from hand to hand around the financial

circle. To assume this would not only create distrust but destroy the credit of the road, for it cannot be supposed that capitalists will lend money on collaterals, the validity of which involved constant legal investigation. If he is " the *hand* of the court," *where does he derive* his authority to pay a bond, cancel and then re-issue it deprived of the protection of the original mortgage by which it was made valuable and negotiable? I see nothing in the order to confer such a power. It appears to me to be a most extraordinary proposition that where a receiver is appointed to protect creditors and property he will be permitted to destroy liens and make new debts on the *faith of those very liens which he knows he has extinguished!*

Now let us consider the condition of things when the receiver took charge of the property under the order of Judge Melton in 1872. The referee, Mr. Green, reports $241,000 (of which these fifty-four bonds were a part) as "*first mortgage bonds outstanding.*" This report is not excepted to and *becomes* a part of the record. These bonds are *annually described*, for a series of years, in the reports of the company as bonds thus renewed. Mr. Manson, the auditor, says: " It was not the intention of Mr. Magrath to pay these bonds; we were not prepared to retire any bonds; these bonds were entered as an actual investment in company's books, and were purchased as any other securities were purchased by the company as an investment of company funds; *these bonds were used for the purpose of raising money to operate the road by pledging them as collaterals for loans.*" How, then, can it be said this was payment, and debtor and creditor uniting in the same person, the lien of the mortgage was lost? That is not all. Mr. Magrath was not examined, but his acts speak with great emphasis. He not only published the bonds in his annual reports, which were distributed, " as first mortgage bonds then outstanding," but he actually incorporated in his notes to Knobeloch and the National Bank of Greenville a description of them as " first mortgage bonds past due." After this there was no use to examine Mr. Magrath to say with what intent he took up and re-issued the bonds. If he did not intend to give them the character of first mortgage bonds, he was practicing a hideous fraud on the men who advanced their money on the faith of that

security.   And it is equally extravagant to suppose, that any man
of ordinary business sagacity would advance his money to a cor-
poration threatened with bankruptcy, in the hands of a receiver,
unless he supposed he was protected by the first mortgage.
Further yet: Judge Pressley, in September, 1879, held "that
the statutory liens were securities, not mere indemnities to the
state, and, therefore, it had no right to waive them in favor of
the second mortgage." From this judgment there was an appeal,
which was dismissed.   Judge Mackey held that the order of
Judge Melton did appoint the president and directors receivers,
from which there was no appeal.   He ordered the master, Mr.
Barnwell, to classify the bonds guaranteed by the state.   What
bonds? The bonds reported as " first mortgage bonds " by Ref-
eree Green—the bonds decided to be first mortgage by himself
and Judge Pressley.   Is not the question *res judicata?*   And
yet, when the master comes to classify the bonds, what does he
do? He overrules Judges Mackey and Pressley, treats Referee
Green's report with indifference, and actually holds, in face of
the adjudications of Judges Pressley and Mackey, that there was
no receiver of the road until the appointment of Mr. Conner.
Instead, therefore, of classifying the bonds in accordance with the
decisions of the court by whom he was instructed, he rules them
out as not entitled to the protection of the first mortgage.   The
act of 1861 provides that " the bonds thus taken up shall stand
as security to the state, and thereby give the state the lien under
the first mortgage, until all the bonds thus secured by mortgage
shall be retired."   As I have said, Mr. Magrath never intended
to retire these bonds and deprive them of the protection of the
first lien.   If, then, he took them up, not to retire them, not to
pay them, but as an investment to save interest and meet the cur-
rent expenses of the road, when he re-issued them, they went into
the hands of the purchasers clothed with all the protection given
them in their original and first issue.

    After all the learning, instructive and interesting, that has
been displayed, it does seem to me, from a careful considera-
tion of the several reports, orders, declarations and judgments
made herein, that this discussion is more of an intellectual gladia-
torial contest on questions of law, arising since the commence-

ment of the suit, than on the law applicable to the facts at the time of the transaction. But at last the real question is, did President Magrath, who issued these bonds, and the capitalists who advanced their money on the security, regard them as first mortgage bonds? On this question we have no doubt they were so issued, so regarded, and are entitled to the protection which gave them value when put in the market. And it is adjudged that they are secured by the first mortgage. Let the decree be reformed in conformity to the principles herein announced.

Here is a motion also to dismiss the appeal of Mr. Fisher, receiver, because a copy of the exceptions was not served on the presiding judge within ten days. The points involved in the appeal having been fully argued by counsel, and the case decided, it is a matter of little consequence to the appellant, Fisher, what becomes of this motion. We have no doubt that Mr. Corbin, attorney for Mr. Fisher, agreeing to pay, and actually paying his proportion of the expenses in preparing the brief, and the cause being fully settled for argument, supposed he had done all that was necessary. But the rule is finally established in Ex parte Clyde, and cannot be departed from.

The appeal of Fisher, receiver, is dismissed.

MCIVER, A. J., concurred.

SIMPSON, C. J., dissenting. The majority of the court has reached the conclusion, in this case, that the bonds in question, upon their re-issue, retained the security of the mortgage by which they were secured in their first issue, and, this being the first mortgage, that therefore these bonds should rank as first mortgage bonds in the distribution of the assets of the company.

Being unable to concur in this opinion, I have dissented, and now propose to state briefly the reasons of my dissent.

The argument of the majority is, that the president and directors of the road became receivers under the order of Judge Melton, of June, 1872; that, as such receivers, they had the legal right to invest their receipts from the income of the road, in such securities as they saw proper; that these bonds were taken in by them as such investment; and being investments,

the receivers had the right to re-issue them afterward without disturbing the security of the first mortgage.  This conclusion is based upon the position that these officers were receivers.  Even if this was so, I do not see that it follows, necessarily, that they had the power to re-issue these bonds, with all their original incidents and surroundings, after once called in.  But I am not satisfied that Judge Melton's order constituted these officers receivers in the strict sense of that term.

It is true that Judge Pressley thus construed this order upon the Circuit, and so has Judge Mackey; and now a majority of the court has so construed it.  In the face of the concurring opinion of so many eminent jurists, of course I differ with great hesitation and. doubt; but still I do differ, and I must follow my own judgment.

The question at issue is as to the intent of the order.  Did Judge Melton intend to make these officers receivers?

The term "receiver" is a technical term, and has a well-defined legal meaning, and, when used in an order, carries with it a plain and well-understood signification.  Besides this, the duties belonging to the office, which the term imports, are also well understood, so much so that the mere appointment of a party as receiver, when the term itself is used in the appointment, at once defines his duties without more.  Such being the fact, it seems probable that had Judge Melton intended to divest the president and directors of this company of their powers as officials of the road and invest them with the new power of a receiver, he would have so ordered, in plain and unambiguous terms ; he would not have left the matter to construction, but would have used the precise and apt words to that end.  This seems so reasonable that his failure to do so can hardly be accounted for on the ground that it was accidental, or that it occurred from inadvertence.  It is more reasonable to suppose that it was intentional.

I venture the assertion that no order can be found in the history of judicial proceedings in which a receiver has been appointed where this term has been omitted.  No such term is used in this order, nor has there been employed any term equivalent to this.  And, although the prominent prayer of the complaint was for the appointment of a receiver, this term seems to have

been carefully avoided in the order.   Besides, the order is defective in other particulars as an order constituting a receiver in a large and extensive insolvent corporation with millions of assets. No bond is demanded ; no inventory of the property and assets required, and no assignment by the company of this property to these receivers is directed.

The order was a consent order, and my construction of it is that the parties agreed that the property, as a temporary arrangement, should be left under the control and management of the present officers of the company until the further hearing of the cause.   In the meantime the creditors to be restrained from interfering with the running of the road—the appointing of a receiver to be left to some future stage of the proceedings.   And this order was intended to carry out this assent and understanding of the parties.

This construction is sustained by the further fact that it is very unusual for the president and directors, as president and directors of an insolvent company, to be appointed receivers of the property and assets of the company pending the litigation. In fact, I doubt whether a case can be found where such officers, as individuals and by name, much less as company officials, have been appointed.   Mr. High is emphatic in his condemnation of such a practice.   The president and directors of a company are officers of the company, elected or appointed by the company, and under its control.   The appointment of such officials, in their official character, would be the same as appointing the defendant company itself.   And I do not suppose that there ever has been an instance, unless this be one, where the defendant has been appointed the receiver of the property in litigation.   *High on Receivers*, § 72.

But, admitting that this order of Judge Melton did constitute these company officials in their official capacity receivers, does it follow that they have the power to buy up the bonds of the company with company funds, and subsequently put them out again subject to the protection and security of such mortgage, if any, by which they were secured in their first issue?

It will be admitted, I suppose, without question, that no

debtor could do this, whether he be an individual or a corporation, where the rights of other creditors are involved.

The application by a debtor of his own funds to his own debts, whether evidenced by notes or bonds, will inevitably extinguish the debt. There can be no such thing as a debtor being the assignee of his own indebtedness in such way as to keep his debt alive to himself against himself. In every contract there must be, at least, two parties.

True, either an individual or a corporation might re-issue his negotiable notes or his bonds, although once taken up and extinguished, but this would be done, not by virtue of any life still existing in such instruments, but by virtue of a new vitality imparted by the new contract of re-issue, and the paper would go forth the second time not as the old paper, but as an original instrument, discharged from all of its former incidents and accompanied with such only as the new contract might attach to it. No authority is needed to support this proposition; it springs from well-known elementary principles.

Now, apply this doctrine to the case at bar.

It is not claimed that the receivers used any other funds in the purchase of these bonds except company funds. Here, then, is the application of the debtor's money to the debtor's debts, not by the debtor's own act in person, it is true, but by the hands of another. This, however, can make no difference, as it is not the medium through which the application of the funds of the debtor is made which extinguishes the debt, but it is the fact that his money has been used.

Besides, could these receivers, had they kept possession of these bonds until final settlement, have presented them against this insolvent company as subsisting obligations and claimed the amount which their assignees are now doing, the full amount due thereon? Could they have instituted action against themselves to enforce payment? They might have held them and obtained, on final settlement of their accounts, credit for the sum paid out by them, but no more. The bonds, while in their hands, were certainly extinct as against the company.

If this was so, even for a moment, was not the mortgage dis-

charged to that extent? and, if discharged, who had the power of re-opening this mortgage and of reinstating these bonds at their full value to the prejudice of other creditors?

My opinion is that when these bonds were taken up by the funds of the debtor they were extinguished, and the mortgage was discharged to that extent.

And this, whether the order of 1872, constituted the president and directors receivers or not.

Decree reversed.